UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF TENNESSEE
AT GREENEVILLE

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | |
| | ) | |
| V. | ) | NO. 2:10-CR-13 |
| | ) | |
| MARC KRISTOPHER SKEEN | ) | |

## REPORT AND RECOMMENDATION

Defendant is charged with being a convicted felon in possession of a firearm. The firearm which he allegedly possessed, a .40-caliber semi-automatic pistol, was taken by officers of the Washington County Sheriffs Department on May 21, 2009 from the home he shared with his mother at 160 Washington Station Road in Limestone, Tennessee. Defendant has filed a motion to suppress any evidence of that firearm, claiming that it was seized without a warrant and violative of the Fourth Amendment to the Constitution. (Doc. 22). An evidentiary hearing was held on June 10, 2010. This motion has been referred to the United States Magistrate Judge under the standing orders of this Court and pursuant to 28 U.S.C. § 636(b).

Only two witnesses testified, Eric Stanton and Kevin Sanders, both deputies with the Washington County Sheriffs Department. The defendant called no witnesses.

The testimonies of the two officers was detailed, thorough, and credited without qualification. What inconsistencies there were between their testimonies was trivial and

inconsequential, and likely attributable to the fact that different people perceive the same event in two slightly different ways.

The defendant is well known to officers of the Washington County Sheriffs Department, including the two officers involved in this case. They knew that defendant was a convicted felon; indeed, defendant liked to brag about his status as being a convicted felon.

Among the prior calls they responded to regarding defendant were reports of attempted suicide. Defendant's mother, Ms. Carr, also is and was well known to the Sheriffs Department.

The officers had answered calls to defendant's and Ms. Carr's home at 160 Washington Station Road in Limestone on numerous occasions. Prior to the incident that led to this indictment, the most recent call to this address was earlier in the same day, May 21, 2009, at approximately 6:30 a.m. Some time prior to 6:30 a.m. on May 21, the Washington County Sheriffs Department had received a call of a car crash in the vicinity of defendant's residence. Various witnesses reported that defendant was the driver of the wrecked car. Defendant had no drivers license, and he denied being the driver. Defendant's girlfriend, Ms. Crawford, told the officers that she was the driver. In looking about the area of the crash, Stanton found a handgun that had been ejected from the car; Ms. Carr, defendant's mother, claimed that the handgun was hers. That gun was seized by Officer Stanton, and presumably remains in the custody of the Washington County Sheriffs Department. That gun is *not* the same weapon that resulted in this indictment.

At approximately 4:00 p.m. later that afternoon, a woman by the name of Cunningham called the 911 dispatcher to report a physical altercation she had just witnessed, including the firing of three shots from a handgun. Ms. Cunningham reported that it was a male who fired three shots, and that he was physically assaulting a female in the front yard of defendant's residence.

When Ms. Cunningham witnessed this altercation and gunfire, she was outside with a group of children at a daycare center adjacent to defendant's property. There were approximately 18 small children present, and several adults, all of whom immediately ran into the daycare building which then went into "lock down." It was from inside the building that Ms. Cunningham placed her call to the 911 dispatcher.

Ms. Cunningham's call to the 911 center was likely more precise and detailed than many calls received by the 911 center, because Ms. Cunningham herself is a full-time 911 dispatcher for Washington County.

Officer Stanton was within the immediate area when he received the call from his dispatcher and, as noted above, he was quite familiar with defendant and this particular address. Officer Stanton arrived at defendant's residence within two minutes. When Stanton exited his patrol car, Ms. Crawford, defendant's girlfriend, who was hysterical, ran up to Stanton screaming, "I can't believe he's done this to me!" Stanton asker her, "Did what?", or words to that effect, to which Crawford responded, "He shot at me." He then asked her who had shot at her, and Crawford responded, "My boyfriend, Marc." Stanton asked

Crawford where defendant was, and she told him he was in the house.

Crawford bore cuts and scratches consistent with being physically assaulted.

Within a minute of Stanton's arrival upon the scene, Officer Sanders arrived. As Sanders got out of his car, Stanton made a hand signal to warn Sanders that a gun was involved. Sanders went to the front door of the house and, before he could knock, defendant's mother, Ms. Carr, opened the door and stepped out onto the porch. She asked Sanders, "What's going on?" Sanders quickly told her about the call from the 911 dispatcher. In so many words, Ms. Carr basically claimed ignorance of the entire situation, saying that she had been asleep.[1]

Sanders asked her where her son was, and where the gun was. At this point, defendant appeared in the living room and then walked outside. Stanton testified that Sanders asked for permission to enter to the house to retrieve the gun, whereas Sanders himself testified that Ms. Carr invited him to come into the house. The fine distinction is of no legal significance; they are in complete agreement that Ms. Carr told Sanders that she would take him to the weapon.

As defendant walked outside, Sanders accompanied Ms. Carr into the house, and she led into a bedroom. She indicated that the handgun was behind a pillow on the bed, and she began to reach for it. Sanders prudently and understandably told her to stop where she was,

---

[1] Ms. Carr did not testify, but a question asked by defense counsel on cross examination of Sanders suggested that Ms. Carr actually said that she was "trying" to sleep. In either event – whether she was asleep or merely trying to sleep – it is incredible to believe that she was unaware of the noise generated by the discharge of a .40-caliber handgun in her front yard.

4

and he retrieved the gun himself.

In the yard, in the general area where Cunningham reported the fracas took place, the deputy found three empty .40-caliber casings.[2]

There are two distinct and equally valid bases on which this motion to suppress should be denied. First, Officer Sanders obtained either the expressed or tacit permission of Ms. Carr to enter her home to retrieve the weapon. As noted earlier in this report, there was some discrepancy between the testimony of Officer Sanders and Officer Stanton regarding whether Sanders asked for and received Carr's permission to enter, or whether Ms. Carr invited him to follow her into the house before Sanders asked her anything. It is stressed again that this "inconsistency" is *de minimis*. What is crystal clear and uncontradicted is that Ms. Carr voluntarily invited Sanders to accompany her into the house to retrieve the gun. A search conducted pursuant to a valid consent, which this was, is a long-recognized exception to the Fourth Amendment's requirement for a warrant. *Schneckloth v. Bustamonte*, 412 U.S. 218 (1973). As owner (or co-resident) of the premises, Ms. Carr's consent was sufficient. *Matlock v. United States*, 415 U.S. 164 (1974).

Second, quite apart from Ms. Carr's invitation to Officer Sanders to accompany her

---

[2]In her cross examination, defense counsel took these officers to task for their failure to precisely mark where these casings were found. Just what were they to mark, and what would have been the point? Should they have pulled out a GPS device and precisely noted the longitude and latitude? What good would it have done to mark the location on a diagram, when it is impossible to precisely transfer that information over to a photograph? It was enough that the officers pointed out the general area in the front yard where the casings were found.

into the house to obtain the gun, there were exigent circumstances that justified a warrantless entry into this house to obtain the weapon. It bears repeating briefly what these officers confronted: the report of a witness (who also was a 911 dispatcher) that she had observed a male assaulting a female, and that the male had just fired three shots from a handgun in the general direction of the daycare center where she was then working; that the responding officers knew defendant was a convicted felon; that the officers also knew his mother; that defendant's girlfriend was hysterical and yelling that defendant had just shot at her; that the girlfriend bore the evidence of a physical assault; that the whereabouts of both defendant and the weapon were unknown; that defendant had threatened to commit suicide on prior occasions. The foregoing had happened within the preceding three or four minutes, at most, and occurred adjacent to a daycare center populated with small children. Had these officers not taken immediate and forceful steps to find both the shooter *and* the weapon, they would have been guilty of dereliction of duty.

The Sixth Circuit recognizes four general categories of "exigent circumstances" that will justify a warrantless entry: (1) hot pursuit of a fleeing felon; (2) imminent destruction of evidence; (3) prevention of a suspect's escape; and (4) a risk of danger to the police or others. *United States v. Johnson*, 22 F.3d 674, 680 (6th Cir. 1994). To justify a warrantless entry based upon the fourth category – safety of law enforcement officers or the public – the threat to the officers or the public must be "immediate." *O'Brien v. City of Grand Rapids*, 23 F.3d 990, 997 (6th Cir. 1994). Here, the threat was certainly immediate. Defendant had

just assaulted Ms. Crawford, and he had fired a handgun. Whether he fired three shots "up into the air," or more in the direction of Ms. Crawford (or the daycare center), is quite beside the point. Defendant was angry enough that he had assaulted Ms. Crawford, and fired a gun. Had defendant calmed down enough within the space of two minutes that it could safely be assumed that he would not burst forth from his house with the weapon and shoot everybody in sight? These officers had received prior calls regarding defendant's attempts to commit suicide; could they blithely assume that he would not turn the gun on himself while they spent the hour or two necessary to obtain a warrant?

It is true, of course, that as Sanders and Ms. Carr went into the house, defendant was exiting the house. But the fact that defendant was then located does not vitiate to any extent the exigent circumstance that still confronted the officers. Finding and securing the weapon which two witnesses, Cunningham and Crawford, reported that defendant had used was still a necessity. It was tantamount to contemporaneously disarming him.

In conclusion, it is reported that Ms. Carr, with whom defendant resided at 160 Washington Station Road in Limestone, consented for Officer Sanders to enter the house and to obtain the weapon therein. It is also reported that the exigent circumstances confronting the officers justified their warrantless entry into the house to retrieve the weapon. On either basis, defendant's motion to suppress should be denied.

It is respectfully recommended that defendant's motion to suppress evidence of the

firearm (Doc. 22) be DENIED.[3]

Respectfully submitted,

s/ Dennis H. Inman
United States Magistrate Judge

---

[3]Any objections to this report and recommendation must be filed within fourteen (l4) days of its service or further appeal will be waived. 28 U.S.C. 636(b)(1).